(164 Misc. Rep. 314)

COFFIN v. TEVIS. (No. 6293.)

(Supreme Court, Appellate Division, First Department. November 13, 1914.)

1. BILLS AND NOTES (§ 340*) — BONA FIDE PURCHASERS — "HOLDER IN DUE COURSE"—"NOTICE."

Defendant agreed to loan F. $25,000 to aid in the promotion of a railroad, if F. could raise $150,000 on defendant's notes, and, on F.'s representation that he had arranged for their discount and would immediately place $125,000 raised thereon to defendant's credit, mailed F. notes aggregating $150,000, with letters stating that F. was authorized to dispose of them "in accordance with our understanding," and that, to enable him to talk intelligently, a statement of defendant's assets and liabilities was therewith furnished. F. diverted these notes to his own use, and plaintiff, knowing that F. was defendant's agent for the purpose of having them discounted and after seeing the letters mentioned, took one of the notes from F. Plaintiff had previously, at F.'s request, gone West to interview defendant as to the promotion of such railroad, and he received the note in payment for such services and for further services which he was to render. Held, that plaintiff was chargeable with actual notice that F. was diverting the note, and that he was being paid a personal debt due from defendant's agent by paper intrusted to him solely for defendant's use, and was not a "holder in due course," within Negotiable Instruments Law (Consol. Laws, c. 38) § 91, defining a holder in due course as one taking an instrument in good faith and for value, with-

_____

out notice of any infirmity in the instrument or defect in the title of the person negotiating it, and section 95, providing that, to constitute "notice" of an infirmity or defect, a person must have actual knowledge thereof, or knowledge of such facts that his action in taking the instrument amounts to bad faith.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 825–828, 842–848; Dec. Dig. § 340.*

For other definitions, see Words and Phrases, First and Second Series, Holder in Due Course; Notice.]

2. PRINCIPAL AND AGENT (§ 153*)—MISAPPROPRIATION OF FUNDS—NOTICE.
Where an agent or other fiduciary uses the property or funds of his beneficiary to pay his own debt, the person taking such property or funds with notice of the agent's personal interest acts at his peril.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 570, 571; Dec. Dig. § 153.*]

Appeal from Trial Term, New York County.

Action by George M. Coffin against William S. Tevis on a promissory note. From a judgment for plaintiff for $3,321.41, entered upon a decision at Trial Term, a jury having been waived, defendant appeals. Reversed, and new trial ordered.

See, also, 147 N. Y. Supp. 1104.

Argued before INGRAHAM, P. J., and CLARKE, SCOTT, DOWLING, and HOTCHKISS, JJ.

Ellwood M. Rabenold, of New York City (Allan R. Campbell, of New York City, of counsel), for appellant.

Edward H. Wilson, of New York City, for respondent.

CLARKE, J. [1] The question involved was whether plaintiff was the holder of the promissory note for $2,500 in suit, in good faith and without notice of any infirmity. The maker of the note was the defendant, William S. Tevis, residing at Bakersfield, Cal. Defendant's story is:

That one Charles W. French represented to him that it was necessary to have $25,000 in order to bring about the promotion of a railroad from Bakersfield to the coast. That he already had arranged for most of the right of way, had the surveys made and reports compiled showing the probable business in freight to be transported from Kern county and intermediate points to the ocean, and that he needed for the completion of this work, and to secure the balance of the right of way, at least $25,000. "He urged me very strongly to loan him this amount of money. I declined to do so. He asked me if I could get this money on my unsecured note through financial friends of his, in Chicago, * * * if I would be willing to advance him this amount until such time as he could repay it through the underwritings which he said he had already practically secured for the building of the road. I informed Mr. French that if he could raise $150,000 on my unsecured note from the First National Bank in Chicago, where he represented to me he was known, on unsecured 6 per cent. six months notes, that I would take the chance of loaning him the sum of $25,000 for the promotion fund he required. He said that he knew that he could do this and considered the transaction practically closed. He wanted me to make out the notes and let him take them at once to Chicago. This I declined to do."

On January 5, 1909, French wrote as follows to Tevis:

"It is mutually understood that, at my solicitation, you have this day executed your paper in the aggregate amount of $150,000, legal title to which

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

you will vest in me on my telegraphic request, which I am to receive and negotiate on the following conditions, to wit: When I shall have definitely arranged for the cashing of said paper, I am to wire you a request that it be forwarded to me. I expressly assume full personal responsibility for the genuineness of such arrangement, it being our mutual intent and purpose that said paper is not to be mailed by you until the discount thereof shall have been positively arranged for. On the cashing of said paper I am to forthwith transmit, by telegraphic transfer of bank credit, $125,000 of the proceeds thereof to the credit of my account with the National Bank of California, of Los Angeles, Cal. On the receipt of such telegraphic transfer of credit the cashier of said bank has been instructed by me, in writing, to forthwith transfer said amount to the *credit* of your account with said bank. The balance of the proceeds of said paper I am to retain as a personal loan from you, bearing 6 per cent. interest from the date of the cashing of said paper. The vesting in me of legal title to said paper is to be purely technical, and for the sole purpose of facilitating the negotiations thereof."

Tevis testified that he told French that he "would not vest the legal title to any of my paper in him under any circumstances, except for value received, and that I would not sign any document vesting the title in him; that the title should remain in me until I received the consideration for the issuance of the paper"; that French handed him a form of letter which he desired him to sign, and that he did not sign the form of the letter so proposed. French started for the East, and there were numerous telegrams and letters exchanged, all based, as Tevis claims, upon the repeated definite assurances of French that the arrangement for the discounting of the $150,000 worth of notes was to be made before Tevis would send them on. On the 12th of February, 1909, for instance, French telegraphed from Chicago:

"Everything has been arranged to close deal and get payment on receipt of papers and documents. Send the papers as soon as possible. Will telegraph banker's credit promptly."

On the 14th of February Tevis telegraphed French that papers were mailed that day. These papers consisted of a letter dated February 5, 1909, addressed to French, which begins:

"In order to enable you to talk intelligently with the financial houses that may undertake to furnish funds for the enterprises you are endeavoring to promote, and in order to give you an idea of my financial strength as an underwriter, I hand you herewith a general statement of my assets and liabilities, which, at the proper time, if you are successful, may be readily verified."

Details follow, showing that he claimed to be worth about $7,500,000. Tevis also sent French this letter, dated February 15th:

"I hand you herewith promissory notes as follows: 20 notes of $5,000.00 each, being numbers 211 to 230, both numbers inclusive, dated San Francisco, California, February 15, 1909, payable 6 months from date with interest at 6 per cent. per annum from maturity, payable to the National Bank of Los Angeles; also 20 notes for $2,500.00 each, being numbers 231 to 250, both numbers inclusive, dated San Francisco, California, February 15, 1909, payable 6 months from date, with interest at 6 per cent. per annum, payable at the National Bank of California, Los Angeles, being duly signed and twice indorsed. Title of these notes is vested in you [*you* is in pen over typewritten *me*, and Tevis swears that that alteration was made without his knowledge and after the letter had been sent to and received by French] and you are authorized to dispose of them in accordance with our understanding. These notes are executed by me and twice indorsed with the understanding that they are to be paid upon the date they are due, to wit, the 15th day of August,

1909. On or before that day I will provide at the National Bank of California in Los Angeles a sum sufficient to redeem all of them. In other words, I will deposit with the bank the sum of $150,000, with instructions to pay these notes upon presentation."

The form of the note in suit is as follows:

"$2,500.               San Francisco, Cal., Feb. 15, 1909.

"Six months after date (without grace) I promise to pay to the order of myself twenty-five hundred dollars, for value received, with interest at six (6) per cent. per annum from maturity until paid, both principal and interest payable only in United States gold coin.     [Signed]   William S. Tevis.

"Payable at Nat. Bank of California, Los Angeles, No. 239.

"Due Aug. 15, 1909."

On its back was the following:

"For value received, I, William S. Tevis, hereby waive presentment, demand, notice, protest, and notice of protest, and guarantee the payment of this note at maturity.           [Signed]   William S. Tevis."

Tevis' story, confirmed by a large number of letters and telegrams, and corroborated by testimony of others, is that French, having obtained possession of these $150,000 worth of notes upon the distinct representation that he had arranged for their discount, and upon the precise promise that they should be discounted in Chicago, and that $125,000 raised thereon should be immediately put to Tevis' credit in the National Bank of California at Los Angeles, deceived him completely; that French had not made any arrangements for the discount of the notes before their receipt; that he never did transmit any credit to him, but, on the contrary, peddled the notes around for his own benefit, had a number of them discounted, and used the money for his own purposes. Tevis subsequently made him deliver back to him $80,-000 of the notes. The rest of them French had disposed of to different persons. The note in suit is one of the notes so diverted by French. The claim is that French's agency was limited to the one precise purpose indicated, and that when French used this note to pay his own indebtedness, upon the face of the papers and under the circumstances connected with its delivery to the plaintiff Coffin, Coffin was put upon his notice and could not be considered to be a holder in good faith and without notice.

There is no doubt that French did swindle Tevis, that he did lie to him, did deceive him, and that he had diverted the notes. The trial court specifically found:

"The instrument in suit was handed to the plaintiff by Charles W. French in breach of faith with defendant and in violation of the express agreement between himself and defendant and under such circumstances as amounted to a fraud on the defendant."

Whatever agency, limited or otherwise, French had from Tevis, was revoked and ended on May 3, 1909, when, after repeated telegraphic and written attempts to procure the money or the return of the notes had been unsuccessful, a personal demand was made upon French for the immediate return of the notes by Mr. Beal, acting for Tevis. Admitting that the burden of proof had been shifted, so that plaintiff was required to show his bona fides, Coffin testified, in rebuttal, in substance as follows:

In 1907 he was president of the Beaver National Bank of New York City. French came to him and asked him to go to the Pacific coast to interview certain wealthy men who were interested in underwriting a concern to be organized in the steel industry, and he mentioned particularly Tevis and Gen. Otis. "I don't recall that he told me specifically what Tevis' interest was. He only said he was a very wealthy man, and, like Gen. Otis, was interested in the development of this enterprise." Coffin went West with him, met a number of people, investigated the question of the railroad, and visited Tevis at his residence in Bakersfield. "Mr. Tevis said he was a joint owner in this estate that comprised 473,000 acres of land in Kern county, through the middle of which the Kern river ran, that had been developed for irrigation at a cost of something like $7,000,000. There was, I think, 1,300 miles of canal, and 3,000 miles of ditches, and about 800 miles of fencing. Mr. Tevis had his residence in the middle of this great estate. He had a beautiful house there, surrounded by gardens and fruit trees." Bakersfield was about 150 miles from the coast, and there was no direct railroad. They were dependent on the Southern Pacific road that connected with San Francisco. Tevis took them to lunch at the club in Bakersfield. French was along all the time. Tevis "told me what his financial worth was—what it consisted of. He went into details about the value of this great property there, and he had stocks and bonds, and he owned some property in San Francisco, * * * and my estimate at the time was that he was worth about $7,500,000 according to his own statement." That was about the 9th or 10th of August, 1907. "While I was in Bakersfield, I was introduced by Mr. French to some independent oil operators there. · That is the center of a great oil belt, and these independent operators, like Mr. Tevis, were very much interested in the building of this railroad, because it would give them a new outlet and make them independent of the Southern Pacific."ⁿ He then went to San Francisco and Los Angeles, and had talks with a good many men out there, and was gone about four months on this trip. This trip was taken solely at the instance of French. Before he went on the trip they had no agreement, but French told him that his "compensation would be made satisfactory, and at Los Angeles, before I started back, he said I would receive $1,000." After they returned the panic occurred, and everything was then dropped. So far, then, as this first trip in 1907 is concerned, there is no ground whatever for coupling Tevis with Coffin. At that time French had no contractual or agency relations whatever with Tevis. He was approaching Tevis in the hope of getting him interested as a possble underwriter of a scheme he was devising. Coffin's employment was solely by French and for French's benefit. In 1909 Coffin was in business as a public accountant. A week before the 1st of May French telephoned him to come up to his hotel, and when he got there showed him the two letters of February 5th and February 15th and the Tevis notes, and wanted to know whether he could help him to get those notes discounted. "Q. Did he say anything about what you would get out of the discounting? A. No, he did not; he may have referred to that thousand dollars that was due me. I can't recall that now."

He testified he did not help French to discount any of those notes; that is, he did not succeed in discounting any; that he was present at a meeting of the Windsor Trust Company about the 1st of May with Mr. French and Mr. Rambaut; that he was invited to be present to tell what he "knew about Mr. Tevis' financial worth and what he told me two years before." They were conferring with the president of the trust company about the discount of those notes. The proposition was before the Windsor Trust Company to discount those notes of $150,000 of Mr. Tevis. He also went to a private banker on Wall street to know whether he would discount them; that he read the words in the letter, Exhibit 2, "dispose of them in accordance with our understanding," and that he could not recall whether he asked Mr. French what the understanding was or not; that Mr. French did not tell him

he was the owner of the notes, only what was in the letter. "Q. Did you go in there (referring to the Windsor Trust Co.) believing that you were going there in Mr. Tevis' interest? A. Certainly I did, so far as it was advancing the trust company—. Q. To enable him to get the money on those notes, wasn't that it? A. Yes; and the underwriting that the trust company was considering. Q. Oh, and that too? A. Yes."

He also testified that French asked him if he would make another trip to the Pacific coast to see these parties again and other parties that were interested in the development of this enterprise. French said he would pay his expenses and would give him a note for $2,500 in payment of the $1,000 due for the first trip and to pay for the services on the second trip. French handed him the Tevis note for $2,500 in suit. He took it out of his pocket with the other notes that he carried, and handed it to him on the elevated train going down town. That was between the 10th and 15th of May. He left for the coast about the 29th or 30th of May. They went to Seattle and saw bankers and people who were interested—had claims to coal mines in Alaska. The idea was to bring the coal supply of Alaska and the ore supplies of California and Lower California together to develop this industry. There was no coal in California at all. He thought there was iron adjacent to the Tevis land. He met Tevis in California on this trip by appointment made by French. French was not there when he saw Tevis. Mr. Denicke of Chicago was there with him. The conversation was not a very long one. He told Tevis substantially what he had done on the coast, what the feeling was there, and he listened, and at the conclusion said:

"Well, if Mr. French cannot carry through this railroad proposition, I will take it out of his hands and do it myself."

That was about the 24th or 25th of June. He had no conversation with Mr. Tevis about this or any other of the notes. French paid his expenses on both trips. In 1909 he furnished Coffin with the money before he went, cashed his check for $500—got it after he received the note. Coffin did not give him a receipt for it. The understanding was that he was to get the note in payment for services and his expenses would be paid. French did not tell him he had to account for this money to any one. He presumed French was getting it out of the proceeds of the Tevis notes.

It is quite clear that Coffin was employed by French to go upon this second trip, as he had been employed by him to go upon the first trip in 1907, for the benefit of French in the prosecution of the scheme or enterprise which French was attempting to put through, and that he was not, and did not claim to be, either directly or indirectly employed by Tevis for that purpose. Whatever claim he had, therefore, was against French. When he received the note in suit he took it, not in payment of any services he had rendered to Tevis or at his request, but for services rendered to French and at his request. He knew that French was Tevis' agent for the purpose of procuring a series of notes, 40 in number, to be discounted, and he had read a letter from Tevis to French which said, "You are authorized to dispose of them in accord-

ance with our understanding," and he had read another letter in which Tevis had written to French:

"In order to enable you to talk intelligently with the financial houses that may undertake to furnish funds for the enterprise you are endeavoring to promote, and in order to give you an idea of my financial strength as an underwriter, I hand you herewith a general statement of my assets and liabilities, which at the proper time, if you are successful, may be readily verified."

Knowing all this, he took one of the notes of this set three months after its date and with three months yet to run, not by way of discount, not in the ordinary course of business, but from a man who he knew was the agent of the maker of the note for the purpose of getting them discounted, in payment of services rendered two years before to that agent individually and for services to be rendered thereafter to him. The whole transaction was of such a character that it seems to us that not only was the plaintiff put upon notice, but that he must have known and did know that in giving him said note French was diverting it and that he was being paid a personal debt due from the agent by the paper of his principal which had been intrusted to him solely for that principal's use and benefit. Everything in this record tends to show that French was the principal in this whole scheme of Western development, and that Tevis, at best, was a prospective underwriter in case the scheme materialized.

Section 91 of the Negotiable Instruments Law provides:

"A holder in due course is a holder who has taken the instrument under the following conditions: * * * (3) That he took it in good faith and for value; (4) that at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it."

Section 95 provides:

"To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith."

[2] It seems to us that, within those statutory provisions, the plaintiff cannot be considered to be the holder in due course. Where an agent or other fiduciary uses the property or funds of his beneficiary to pay his own debt, the person taking the same with notice of the agent's personal interest acts at his peril. In Gerard v. McCormick, 130 N. Y. 261, 29 N. E. 115, 14 L. R. A. 234, an agent paid a personal debt with a check signed as agent. In affirming a judgment in favor of the principal against the person who had received said payment, the court said:

"A person who knowingly receives the money or property of a principal from an agent in payment of the latter's debt does so at his peril; and if the agent acted without authority, the principal may, on proof of these facts, recover his money"

—and held that the form of the signature to the check was sufficient to put the defendant upon inquiry.

In Manhattan Life Ins. Co. v. Forty-Second St. & Grand St. Ferry R. R. Co., 139 N. Y. 146, 151, 34 N. E. 776, 777, the court said:

"It is an old doctrine, from which there has never been any departure, that an agent cannot bind his principal, even in matters touching his agency, where he is known to be acting for himself, or to have an adverse interest."

In Rochester & C. T. R. Co. v. Paviour, 164 N. Y. 281, 58 N. E. 114, 52 L. R. A. 790, where corporate checks were given by the treasurer in payment of his individual liability, the court said:

"If the defendant knew or believed, or had good reason to believe, that, in giving the checks, Briggs was appropriating the money of the plaintiff to the payment of his own debt, or one that he treated as his own, he had no right to accept them without inquiry. While he was not bound to be on the watch for facts which would put a very cautious man on his guard, he was bound to act in good faith. * * * Even if his actual good faith is not questioned, if the facts known to him should have led him to inquire, and by inquiry he would have discovered the real situation, in a commercial sense he acted in bad faith and the law will withhold from him the protection that it would otherwise extend. * * * One who suspects, or ought to suspect, is bound to inquire, and the law presumes that he knows whatever proper inquiry would disclose. While the courts are careful to guard the interests of commerce by protecting the negotiation of commercial paper, they are also careful to guard against fraud by defeating titles taken in bad faith, or with knowledge, actual or imputed, which amounts to bad faith, when regarded from a commercial standpoint."

In Ward v. City Trust Co., 192 N. Y. 61, 84 N. E. 585, it was held that the form of the check gave notice that a private liability was being paid by corporation funds. The court said:

"The effect of such notice was to put the trust company upon inquiry to see whether it was about to accept money from one to whom it did not belong in payment of its own claim."

The case at bar seems to us to present stronger evidence of notice than in those cited, where it depended upon the form of a signature to establish the agency. Here the agency was known and admitted, and the principles above laid down are all the more applicable. It follows that the plaintiff was not entitled to recover.

The judgment should be reversed, and new trial ordered, with costs to appellant to abide the event. All concur.