(164 App. Div. 324)

RAMBAUT v. TEVIS.   (No. 6292.)

(Supreme Court, Appellate Division, First Department.   November 13, 1914.)

BILLS AND NOTES (§ 340*)—TRANSFER—BONA FIDE HOLDER.
    Plaintiff, who performed legal services for a promoter for the promoter's own personal interest, and who, after the promoter's authority from defendant had been revoked, to defendant's knowledge, received from him in payment for the services a note executed by defendant, whose relation to the enterprise was that of a prospective underwriter or purchaser from the promoter, received the property of defendant, diverted by the promoter, in payment of his own debt, and was not a bona fide holder in due course and without notice.
    [Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 825–828, 842–848; Dec. Dig. § 340.*]

Appeal from Trial Term, New York County.
    Action by Thomas D. Rambaut against William S. Tevis. From a judgment for $6,643.75 on a note entered on a decision, a jury having been waived, defendant appeals. Reversed, and new trial ordered.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

See, also, 147 N. Y. Supp. 1104.

Argued before INGRAHAM, P. J., and CLARKE, SCOTT, DOWLING, and HOTCHKISS, JJ.

Ellwood M. Rabenold, of New York City (Allan R. Campbell, of New York City, on the brief), for appellant.

Edward H. Wilson, of New York City, for respondent.

CLARKE, J. This was an action on a promissory note for $5,000, made by the defendant to his own order and indorsed by him, and the question involved was whether the plaintiff was the holder in good faith and without notice of any infirmity therein. The facts in regard to the making of the note and the delivery of the same, with others, amounting in the aggregate to $150,000, by the defendant, to Charles W. French, and the diversion thereof by French, have been set forth in the opinion in Coffin v. Tevis, handed own herewith, 149 N. Y. Supp. 986. It will be necessary, therefore, to consider only the evidence offered in rebuttal, by which the plaintiff undertook to show that he was the bona fide holder in due course and without notice.

The plaintiff has been a practicing attorney for 27 years. He met Charles W. French for the first time May 3, 1907. He testified:

That French said he was chairman of the board of directors of the Pacific Steel Company, a corporation organized under the laws of California, with an authorized capital stock of $100,000,000; that the organization fee of $10,000 had been paid to the state of California; that Gen. Harrison Gray Otis was the president of the company. He mentioned the names of a number of men who were wealthy and who were interested in the success of the enterprise, mentioning particularly William S. Tevis, of Bakersfield, who was worth some $6,000,000 or $7,000,000 in his own right, and controlled four or five times as much property as trustee or manager of his father's estate, the late Lloyd Tevis; that Mr. Tevis was particularly interested in the success of the steel enterprise, because it involved the building of a railroad from Bakersfield to a point on the Pacific coast. He said he represented the gentlemen whose names he mentioned, and particularly Mr. Tevis, who was going to assist him with money and in working out the plans for the benefit of Tevis and these men. French "said he wanted me to draw up such legal papers and advise him regarding such legal proceedings as would be necessary to put the matter in such shape as it could be presented to Eastern capitalists." The first interview took probably two hours. "Then he said he would return in two or three weeks and expected me to advise him. I gave the matter some study during the month of May and thought out some plans. I saw him again on the 3d of June. * * * I advised that the plan could be carried out best by the organization of certain independent corporations to deal with the iron ore, the limestone, the coke-making coal, railroads, a line of ships on the Pacific coast, and there was also a proposition about colonization of the place where the steel company would be located with people who were skilled in manufacturing steel. * * * I drafted an underwriting agreement, and a trust company agreement, and stock participation certificates, which I submitted to him from time to time. * * * When I got an underwritng agreement drafted up in a tentative way, he told me he wanted me to go with him to the Astor Trust Company, as he wanted that trust company to become the trustee under the underwriting agreement. * * * I had several interviews with their counsel." He finally drafted the agreement so that it was satisfactory to them. Shortly after French went to the Pacific coast with Mr. Coffin and some other gentlemen. Then came on the stringency of 1907, and Mr. Coffin, when he returned, "told me how severe it was out there, and that he would probably not hear anything more for some time, and we did not. * * * He related the interview he had

with Mr. Tevis." On the 16th of March, 1909, Mr. French came into his office. "That was the first time I had seen him since he went West in 1907. He stated that now Mr. Tevis was going ahead with this proposition, irrespective of the actions of the other parties, so far, particularly, as the railroad was concerned. Mr. Tevis had given him promissory notes to furnish him with means to pay for the preliminary expenses and surveys of the railroad and getting the underwriting signed and so on, and showed me then a bunch of notes. He said there were 40 of them, 20 of $5,000 apiece, and 20 of $2,500 each, and he handed me two letters, signed with the name of William S. Tevis, and I read the letters. ＊ ＊ ＊ He said that there would be a construction contract with the MacArthur Bros. of Chicago for the construction of the railroad. There would be a railroad mortgage with bond issue. He told me he wanted the Farmers' Loan & Trust Company to act as trustee on the bonds and mortgage, and he requested me to be prepared to advise him regarding such contract and bonds and mortgages. ＊ ＊ ＊ In a day or two I went around with him to the Farmers' Loan & Trust Company and we had a long conversation, lasting nearly two hours, with Mr. Marsden, the president. Mr. Marsden said that the business seemed to be very good, and that as soon as MacArthur Bros. signed the contract, to come right in there, and we would start in taking up the preparation of the mortgage, the bond issue, and such usual proceedings as followed. ＊ ＊ ＊ I told him that I advised him that there be an underwriting agreement, as I had before, and in that case it would be an underwriting agreement as to bonds for a railroad, and he wanted me to see the Windsor Trust Company regarding the underwriting agreement and trust agreement and participation certificates that would be used, because he wanted to try to negotiate with them to see to the advancing of money on the underwriting to get the enterprise under way. I went to see Mr. Young, of the Windsor Trust Company. I went alone, and I went with him several times, and we discussed the forms of underwriting agreement, ＊ ＊ ＊ and I drew up some tentative papers and clauses, and made quite a study of the situation, particularly in regard to the railroad and also in regard to the steel company." Shortly after this French went West, stating that he was going out to have Mr. Tevis come back to New York with him. "I think it was somewhere about the latter part of May. Q. When he said that he was going, did you have anything to say to him as to compensation? A. Yes; I told him I thought I had done enough now without receiving compensation, and that I wanted to be paid something. I wanted to be paid at least a retainer of $5,000, or something on account anyhow. I thought my services were worth twice that, take it in all from beginning to end. He said that he thought so, too; but he did not have any money to give me, and he would offer me one of Mr. Tevis' notes for $2,500. I think he pulled it out of his pocket. I would not look at it. I said, "I won't take it." I thought it was too small a payment at that time, and he said, "Then, if you insist upon it, I will give you one of his notes for $5,000." French gave him the note on the 4th of May, and it went to protest at maturity.

## On cross-examination he said:

He had never seen Mr. Tevis, or had any communication from him, except through Mr. French and Mr. Coffin. "They were talking to me, telling me what he said." When he received this note from Mr. French, he did not render any bill. It was a payment on account, as he told him. He gave him no receipt. He made no entry in his books of account. He made no apportionment between his services in 1907 and 1909. He included them all in this charge of $5,000. He had not previously, in 1907, when the matter lapsed, rendered any bill for his services. He saw these other notes that were referred to in the letter of February 15th. They were all laid on his desk, the whole 40 of them. Mr. French said they were all there. "Q. Did you render any services in connection with these notes? A. Well, I did probably incidentally try to help Mr. French out when I could once in a while, in talking about the thing; but that is not what I have charged for. ＊ ＊ ＊ I was employed to do legal services. He was working at the promoting end of it and getting his notes discounted if he could. Q. Do you remember any interviews at which the question of the discounting of those notes came up? A.

Yes; I do. I remember one. It was in the Windsor Trust Company. I went there to hear the whole thing discussed about the underwriting of these companies and financing it, and all that, and at that time Mr. Coffin was there, the notes were there, or at least a lot of notes were there, and at that time Mr. French exhibited these Tevis letters, and the Tevis notes, and the signature of Mr. Tevis that was certified by a bank, a national bank, under seal. Q. That was on a separate paper? A. Oh, yes; Mr. Young looked at them, and examined them all, and discussed the underwriting and financing. Q. What did the underwriting or financing have to do with these notes? A. Why, nothing, except that they were transacting two kinds of business at one time, and Mr. French had to get—or at least he said he had no money of his own and he had to get—these notes discounted and go on with the checking up of the survey; that is one of the things he said ought to be done, and with MacArthur Bros. of Chicago checking up the survey. Q. He said he was doing this for Mr. Tevis? A. Yes; and as I understand, Mr. Tevis had the survey made with this Mr. Crocker, or whatever his name was, and he had been to Chicago and gone over it with MacArthur Bros.' engineer, and they said, of course, they had to check it up before they could sign any contract with the road. I heard all that from Mr. French, yes; that was all discussed that day. I think we went up to Mr. Young's office. Q. And he was discounting these notes for Tevis; is that what your understanding of it was? A. Why, that is what they were talking about part of the time, yes; and Mr. Young told me they would discount the notes if Mr. Tevis would come to New York and sit down with Mr. Mills, one of their directors, who knew the entire situation, and Mr. French said he would get Mr. Tevis to come here. Q. Was Mr. Coffin there when that conversation took place? A. I think he was. * * * Q. Did you have any connection with the Windsor Trust Company at that time? A. Why, I had a deposit there for some time, and I had acted in counsel in one of their matters for them. Q. Did you introduce Mr. French for the purpose of enabling him to do business there with respect to the discounting of the notes? A. I went there to take up the underwriting agreements, to get them to do the trust company business as outlined in the underwriting agreement generally, and I did mention to Mr. Young, or rather he mentioned to me, that Mr. French wanted these notes discounted, and I told Mr. Young that he would have to do that on his own responsibility."

The defendant relies on the proposition that, where an agent or other fiduciary uses the property or funds of his beneficiary to pay his own debt, the person taking the same with notice of the agent's interest acts at his peril. Gerard v. McCormick, 130 N. Y. 261, 29 N. E. 115, 14 L. R. A. 234; Manhattan Life Ins. Co. v. Forty-Second St. & Grand St. Ferry R. Co., 139 N. Y. 146–151, 34 N. E. 776; Ward v. City Trust Co., 192 N. Y. 61, 84 N. E. 585; Rochester & C. T. R. Co. v. Paviour, 164 N. Y. 281, 58 N. E. 114, 52 L. R. A. 790. Plaintiff knew that French held these notes for the benefit of Tevis. He testified that he knew that French, in offering these notes to the Windsor Company, was discounting these notes for Tevis, to get money for Tevis. He wrote to Tevis in his letter of September 9, 1909:

"The absolute form of your note, and the recognition of Mr. French accorded him by you, precluded my having any glimmer of a doubt about his authority to deliver the note to me and your intention to pay the note at maturity."

But his claim for fees was a claim against French. French employed him. Tevis was not his client. No word ever passed between Tevis and him. The underwriting agreement prepared by Rambaut in 1907 shows that "Tevis and his associates," as Rambaut calls them, were to buy what French was to sell. He looked to French alone for pay-

ment, and never charged or billed anything to Tevis. The plaintiff's work was the law part of promotion work, and the promoter was French, not Tevis, as the plaintiff well knew. The letter of February 5th shows on its face that Tevis' relation to the enterprise was that of a prospective underwriter, and French's was that of a promoter. It begins:

"In order to enable you to talk intelligently with the financial houses that may undertake to furnish funds for the enterprise *you are endeavoring to promote*, and in order to give you an idea of my financial strength *as an underwriter*, I hand you herewith a general statement of my assets and liabilities, which at the proper time, *if you are successful*, may be readily verified."

Mr. Rambaut testified that in 1907 Tevis' name was mentioned as one of the underwriters, that in the paper he then drew he was to be one of the vendees, that French was the vendor, and that he continued the same kind of arrangement, with modifications, in the papers he prepared in 1909. His testimony in regard to the first introduction to French, in which French told him that he was the chairman of the board of directors of the Pacific Steel Company, with an authorized capital of $100,000,000, demonstrates that it was in the promotion of this steel company that French engaged the legal services of Rambaut. In short, the plaintiff performed services for French, the promoter, at French's request and at his direction, for French's own personal interest and gain, giving rise to a debt between him and French, recognized as such on both sides. And so when he received this note of Tevis he knew that he was receiving the property of Tevis in payment of a debt owed by French.

It seems to me that, under all the circumstances known to him, the large number of notes which he knew French was attempting to discount for Tevis, his failure to take any ordinary precaution, to make any inquiry of Tevis, whose address he knew, when he took the note in payment for past services rendered to French, compels the conclusion that he did not become the bona fide holder without notice and for value, which would permit him to recover. He received a diverted note in payment of an individual debt from the diverter to him. When he received the note from French, whatever authority French had had been revoked. An inquiry by telegraph or mail from Tevis, which it was incumbent on him to make under the circumstances, would have disclosed the whole situation. It follows that the plaintiff was not entitled to recover.

The judgment should be reversed, and a new trial ordered, with costs to appellant to abide the event. All concur.